Thank you, Your Honor. Counsel, my name is Larry Forsythe. I'm here on behalf of Pam Sellner, Tom Sellner, and the Cricket Hollow Zoo, and my co-counsel is Mr. Webb Wassmer. I'd like to start off by talking about standing in this case. I believe that we have pointed out defects not only for the individuals involved but also for the organization, the Animal Legal Defense Fund, as far as standing in this litigation. Let me interrupt you. Cutting through the mustard, so to speak, my feeling after reading everything is that the real issue in this case is what we're going to do for the lemurs and the tigers, right? The lemurs and tigers, yes, they've been transferred already, Your Honor. They've been transferred to other facilities, actually. If I'm wrong, it's a question of where you're going to put them. I'm probably the only one on the panel that knows anything about lemurs, but I've been to Duke University and been through their research facility, about 1,200 lemurs, so I know a little bit about them. I've seen them. That's probably the preeminent place in the country for lemurs, Your Honor. Lemurs are scattered throughout the country, and there are many, many lemurs throughout the country. Duke probably is the most preeminent in the country. The judge decided at a special hearing as far as what to do with the animals, the tigers, and also the lemurs, where to send them. The recommendation by the Animal Legal Defense Fund was to send them to a facility in Colorado, and we've pointed out some of the problems with that facility. We have some of the reports from APHIS of the USDA inspectors that show problems with that facility, as well as a newspaper article about the man that ran the facility that talked about euthanizing the animals if he didn't get enough money. That's Mr. Pat Craig out there. As far as the lemurs, the recommendation of the ALDF was to send them to a Florida facility that hadn't even been inspected or started by Tracy Finn, and again, we have reports from USDA about the facility she was at in Florida, Jacksonville Zoo, I believe it was, and again, violations there. So, as far as the disposition of the animals, they went to a place in Wisconsin, and again, we showed USDA reports. Many of these reports show no noncompliances. In other words, they're clean reports. The lemurs went there, the tigers went to a facility or a sanctuary in Indiana, which already has many, many tigers there. It was rated as one of the top ten sanctuaries in the country by a rating service. We believe that it was a good choice by the court. We believe the court exercised its discretion to decide where to send these animals, and I don't believe that that's really a problem with what the court's decision was in this case. With regard to the cases... What's the record of the places they are now residing? Have they had any violations? I don't know if they've had any violations since the case was tried. Either under APHIS or the EPA or anything else? I mean, the environmental... the EPA, yeah. Yeah. No, I haven't heard of any violations of those facilities, Your Honor. You don't know?  All right. Going back to the standing issue, what... And basically it continues on that way. I don't know for sure, but they have never said in any record that we have before us what the situation is with regard to the membership. Is it you just pay your dues and that's it? And I think you need something more than that to allege that they can represent ALDF in this case. With regard to the actual prosecution in this case, I should say that there were originally five different species that ALDF said were endangered species. Tigers, lions, lemurs, servals, and hybrid prey wolves. And it actually came down to just tigers and lemurs eventually at the end of the case. Until recently, the Animal Welfare Act and the ESA have kind of been amiable statutes. In other words, nobody said that one interferes with the other one because of certain types of exceptions under the ESA for animals that were contained within the zoos. In other words, if you were following a licensed facility and you were basically licensed from year to year, you were considered to be exempt almost from the ESA unless you actually went out and harmed an animal in some fashion. And the definition of harm under the ESA is an act which actually kills or injures wildlife. And in this case, I'd argue we don't have any type of situation like that with regard to Frigate Hollow Zoo. Are the regulations broader than the statute? Do the regulations provide more protection to these animals than the literal words of the statute? I believe they define it, but I don't think they provide more. I'll put the question then in. Are you saying that the AWA is sort of a safe harbor for your clients? If they're in compliance with the AWA, they are immune from further investigation, as it were? No, they're not immune from it, but I think it provided a safe harbor for them in many ways. In other words, if they lost their license, I don't think they'd be immune from ESA. Can you say that? The statute itself says that a licensed facility under the harass category, a licensed facility basically licensed by the USDA, is exempt from the harassment type of argument. Because otherwise you'd have the argument that any time you can find an animal, you'd be changing its habitat, or it would be in a different situation than it would be in the wild. And basically what they're saying is if you comply with AWA, then you're not going to get in trouble necessarily with ESA. And I think the reason why these cases are suddenly appearing is because that is being challenged by ALDF. So is the recent decision of the, I guess it was the Fourth Circuit, is it Fourth Circuit? I believe it was, yeah. The Hill case, does that cut against your position? Certainly the, I think the majority opinion does. The dissenting opinion I think raises some interesting issues. My reaction, it seems like an interesting issue, but is it, how persuasive is it? I guess that's for us to decide later. Right. And I read the dissent in particular because certain problems are going to appear, the court's going to start substituting their judgment for AWA officials, basically, in these types of cases. And we're going to have to come to some standards that are going to be amorphous because you're going to have various experts testify about what the best situation is for, like for instance lemurs or tigers or other animals. You're going to have AZA, which is a different type of organization that's going to have different standards than the normal zoo would have. And what, exactly what do you want us to do? Well, I would like to have the decision, first of all, the court decide that there's no standing for the- Well, that's a quick, you have to, all right. Or the organization itself, ALDF in this case, because they didn't have a corporate representative here. So what would happen if we were to agree with you? Well, then I think the case would be sent back down to the court and the decision would be vacated, I believe. Well, back to- And the couple would be back in business, the lemurs would come back, the lions would come back, tigers come back? I'm not necessarily saying that, Your Honor, but they are in business still. They do have a zoo still. Back to the membership of this group, some of the individuals do come and visit this, or have, that's why we're here, I guess. Can there be individual standing without organizational standing? Yes. If there is individual standing, how do you address that? Well, I think there are two cases here. There's the Laidlaw case and there's the Lugin case. And Lugin was the case where I think somebody went to see animals, I believe it was in Africa, and they said they were going to go back. And the Supreme Court stated that was not enough. You have to have a concrete- And then we come back to the individuals. I guess some of them live only a short distance. Does that change the analysis a little bit? In other words, it's not like they're going to Africa. They're going, I don't know how many miles away they live from here, but according to the briefs, this must not be too far because they intend to come back and visit. It may, yes, it may affect that. It may make it more reasonable as far as whether or not they're going to come back and visit. I have this question, and it may not even be an issue in this case. It may not be something that your side thought was problematic, but in looking at the Endangered Species Act, and it uses this term take, when I read the section that prohibits, makes it unlawful to take the endangered species within the United States or the territorial treaty of the United States, a reasonable person could look at that and conclude that it refers to out in the wild rather than animals in captivity. Is that an issue in the case, or is that so well established that it's not even worth talking about? I think that's an issue, too, and I also think that the issue is within a state, basically, you can transfer these animals. I think it has to cross state lines, basically, before you get into the ESA. So I think that take is also defined as harm or harassment. Those are the two terms we were talking about before. And harm, again, refers to an act which actually kills or injures wildlife. Such act must include significant habitat modification or degradation, it says. But I guess my question is, do you concede that it can apply to animals in captivity that are in a zoo setting, for example? I believe it can, yes. There's no need to even worry about that aspect of the act. Well, I think it's kind of a strange wording, the act. It makes it look like it's applying to somebody going out and actually capturing these animals and bringing them back. But I think the terms can be construed broadly enough, in some cases at least, to include being in captivity in a zoo, for instance. Well, the regulations seem to be broader. They talk about, I never know what they pronounce. In the Army, they pronounce harass as harass. In civilian life, it's harass. Well, anyway, by annoying the animals. You know, I read that, and I'm a farm boy, and I talked about all the things about picking up feces and all. I said, that's what I grew up doing, but we never thought about it. The concept of annoying animals was new to me. I didn't realize that lemurs, obviously I haven't read all these articles that the amicus briefs talk about, but it's fascinating. I mean, they suffer from boredom, and they're morose, or what's the term, anhedonic, they don't enjoy life. But there it is, the regulation is there, and again, how do you distinguish the regulation? Did you say the regulation can't control the statute? What is your argument? I think that's true, the regulation can't control the statute, it's got to go along with the statute, I think. I mean, because the district court relied upon that definition of harass and harm. True, and Dr. Plopper... Of course, some of the animals did die, and of course, your argument is what? There's no causal relationship between the conditions of confinement, as it were, just sort of natural death, their lifespans that expired, and like all of us, died? Yes, basically. But you have, back to the court's findings, do you challenge the court's findings about the conditions? Yes, I do. I call it confinement, for want of a better term. Well, the reason why I challenge them is because the court used basically APHIS reports in this case. That's only one of them. There were a lot of them, actually. But that was part of what the court was looking at here, was APHIS reports. And the APHIS reports can be challenged, because basically they just sit there until APHIS decides to take an enforcement action. And I've been involved in several litigations with APHIS about their reports. And they don't always end up being violations when the judge eventually makes a decision. They have a long history of violations under APHIS, but they also have factual evidence in the record for the Endangered Species Act. Also the other statutes involved. How can you say that they complied with the statutes? Well, that brings up an interesting question, too. Do they have to comply every minute with the statute? In other words, can they have no violations, or alleged violations, I should say, by an APHIS inspector? And if that is the standard, then every zoo in the country is in trouble. Because every zoo in the country has violations, or alleged violations. I see my time is running out. Very well. Thank you for heeding my admonition. Thank you, Your Honor. We'll hear from counsel for the appellees. Mr. Carr, is it? Yes, it is. Good morning, sir. You may proceed. Good morning. Mr. Carr, I want to ask you the same question I asked your colleague. What do you want us to do? As to the remedy of where the animals have been transferred, we'd like this court to reverse that decision and remand it to the district court to exercise its full equitable authorities to find a home, or, as it were, a remedy that would fully cure the attacks that have occurred here. There's a broad range of powers that the district court has to do that, but ultimately, at its core, the remedy has to ensure that there's no longer going to be a taken. They're not going to be subjected to all the various conditions. Well, one of the suggestions, I believe, in the record was to appoint a master, take it really sort of away temporarily, at least from the district judge, and let the master pick the place based on the evidence that he or she develops as to where they go. That's correct, Your Honor. That's one of the avenues that the plaintiffs or the appellees had pursued after the violations had been found. I think one of those options would have been a full exercise of the district court's equitable authority, as opposed to what happened here where the court essentially said, I just have to find that the defendant's proffered suggestion is good enough, despite all the problems that the record showed with the facilities that the defendant said proffered. His ruling, the district court's ruling, effectively said, well, I actually literally said, would it be my first choice as it relates to the Tigers? Maybe not, but that's not the question the court was required to answer. I just have to find it's capable of meeting their needs. I think the statute goes further as a broader purpose to ensure that any take is fully remedied and cured. Is the court's language that you just cited an indication that it had considered other places and for whatever reason decided that it would not choose it, or that the court would not choose a better place or want a better term? Well, the court's decision considered at least two alternatives, the one proffered by the plaintiffs, my clients, and the one proffered by the defendants, and weighed those two against each other. What was your preferred location? For the Tigers, it was a facility in Colorado. The district court chose the one in Cincinnati? Chose one that was in Indiana. That was the Exotic Feline Rescue Center. We had proffered a facility in Colorado for the, the name is escaping me right now, Your Honor, but... The one in Jacksonville, Florida? That was for the lemurs, Your Honor. For the lemurs. That's the one that had a resident veterinarian? Yeah. I believe that's correct, Your Honor. And a part-time veterinarian? That's correct. Right. And that was the one that the court said didn't have USDA approval, which to me doesn't mean much. Right, and that was the primary basis for finding that that was not the appropriate facility. Your Honors, I do want to turn to some of the arguments that the appellants made in their appeal of the merits order. And briefly on the standing issue, Judge Woolman, I believe you asked this question, do we have to find the individuals and the association board that have standing? The answer to that question is no, and in case the question wasn't clear, if one plaintiff has standing, the court has jurisdiction. The case is justiciable, and the court need not go any further. That was addressed in an Eighth Circuit decision in 2011, Sierra Club. So if the court is satisfied that any one of these plaintiffs has standing, has a sufficient aesthetic or recreational interest that was harmed by the takings that occurred here, then the inquiry need not go any further. And frankly, the record below that the district court developed on the facts, finding that the location, as you mentioned, where these plaintiffs lived, their visits to the zoo, their interest in animal advocacy, all of that was sufficient under Supreme Court and other court of appeal precedent to establish a real injury in fact that was particularized and sincere to these plaintiffs. Now turning to the violations that the court found. So back to standing. Is there a difference? Does the analysis change when one plaintiff is interested in seeing aesthetic interests protected in nature as compared in a business? In other words, I don't mean to be flip about this. I suppose I'm offended when I go, and I haven't gone to one, if I go to a mixed martial arts thing and I see the mayhem, the gross physical abuse that some people seem to love, or even going to an NFL football game where we know statistically that X number of percentage of the players on the field are going to suffer from traumatic brain injury, why shouldn't I have standing to bring some sort of citizen suit against that? My option is not to go, and that's the one I'm exercising right now. One, I don't have time to go watch NFL because I can't even have time to read the briefs. But seriously, isn't there a difference between a nature type of aesthetic interest and a commercialized business like these people are running? Well I think there's an important difference between the examples you cited and the example we have in this case. And that's that Congress passed a very broad statute, the Endangered Species Act, with a private right of action for citizens to do this. And that's the key to it. My only recourse as an NFL watcher is not to watch. I'm not aware of a cause of action for that. I'll ask you another, well, I'll ask you a question. You don't have to answer this. I've been thinking about this. Is there any way in the world, given the state of this record, that these two people, hardworking people, could possibly comply with the restrictions that your clients would insist be enforced? My answer to myself is I don't think they can do it. The husband is a welder. The wife does all the other work. And at what point can a private facility possibly comply with the restrictions that these aesthetic loving people, and I don't mean that disparagingly, would seek to impose upon them? Well I think the district court touched on that question you asked. In other words, should there be a level of discretion on the part of the reviewing court, or a level of flexibility on people like the plaintiffs here or the appellants, and compared to the unlimited funds, for example, that the Doorly Jew has in Omaha? I've never been there, but I guess it's one of the best in the country. It is, your honor. Irrespectfully, the district court touched on this issue and said the defendants just didn't have the resources. They don't have the staff. They don't have the money to care for endangered species. And the statute, as it applies to listed species that are at risk of extinction, and that's why they're listed, the Supreme Court has construed that statute, dating at least to 1978, and that's the Tennessee Valley Authority case, to say the plain intent of this statute is to protect endangered species, whatever the cost. And they are taking on added... Oh, you weren't even born when that case, no. Maybe 1972, 82, but I can't remember the name of the case. And the court read the statute literally. I think maybe some members of the Supreme Court thought that the result was so outrageous that Congress would amend the act, but that was a vain hope on the part of those who hoped that. I don't know what I'm trying to say here, except that maybe if this law is enforced as strictly as Congress wanted it enforced, it eliminates probably privately held zoos of this nature. The roadside zoo. Well, I think there's an added responsibility for anyone that wishes to have endangered species, and that responsibility, that those costs are clear, and they were intended by Congress and recognized by the Supreme Court. Sure, that's the answer, if you want to be in this business or a sideline, you have to pay the financial price of being able to comply. At what point, to what extent, do we have power to review the district court's findings of the harm to these animals, the tigers and the other animals? Well, those factual findings were reviewed for clear error. And the court had a long decision on the merits, but about 37 pages of that decision were devoted to recounting the evidence as it relates to not just the reports, the citations, but the witness testimony from both sides, the documents that the defendants themselves had in terms of their maintenance and their care, the veterinarians, the experts who had all testified. There was ample evidence that the court reviewed, and frankly, I don't think this court will find that any of those factual findings about the waste that was in these facilities, the conditions that the lemurs or the tigers were being held in, those are all very carefully reasoned, very carefully considered, weighing of the evidence that the district court did. I must say that I, far more than I have, had to smile when I was not familiar with how sensitive some of these animals are to their surroundings to the point that one of the articles, and I didn't read it, I just read the headline, the adverse effects on the copulatory functions of some of these primates if their conditions are not to their liking. But I guess that's what Congress intended, is would your response be, that's the way it is, that's the way it is. The experts and the fact that there are 2 million or 20 million people starving in a sedan today should not be any of our concern. We have to concern ourselves with the lemurs and the tigers, which is a blunt way of putting it, I suppose. Well, under the act as written and expressed by Congress, that's correct. Congress intended that this sort of thing be taken care of. It did, it did. And we shouldn't agonize over that as a practical matter. Respectfully, I think it's clear. I do want to turn briefly to Judge Shepard's question about the scope of the statute. And looking at the text of the statute, you asked, can it apply to animals during captivity? The answer is yes, under the text of the statute. It applies to any person who commits a violation with respect to any endangered species. There's no restriction there as to whether that person has to be somebody in the wild or somebody who's holding those animals in captivity. And, in fact, the regulations enacted under this act have explicitly said we're not making a distinction between the animals. I saw the regulation, and I don't think it's really, it's not really been raised here by the parties, and so you didn't go into it. But is there a landmark or a key case that clarifies that the Endangered Species Act and its reference or use of the word take also applies to animals that are in captivity? Well, the cases are actually recently being litigated, to be frank. The Fourth Circuit's decision in Hill v. Coggins is one of them. And the other decision that came out of the Western District of Texas just earlier this year reads the same conclusion. And looking at that same text, found no distinction between where the taking occurs, whether it's in the wild or the Supreme Court. We don't have a Supreme Court case on that issue at this point. You've got some Circuit Court cases. That's correct. This definition of harassment that my colleague referenced as somehow exempting any exhibitor with a license is not so broad to just go only into the question of whether a facility has a license. First of all, I do want to clarify that the District Court's finding as related to tigers involved both harm and harassment. And harm contains no such similar exemption. Therefore, as it relates to the tigers, the license or lack thereof or the status of the license with cricket hollows is frankly irrelevant to the finding that the tigers were harmed and subject to a take. But as it relates to harassment, this definition excludes from the definition of harassment generally accepted animal husbandry practices that meet or exceed the minimum standards under the Animal Welfare Act. Now, it doesn't say it exempts anything a licensed facility has. So simply having a license cannot be the beginning and the end of the inquiry. In fact, the Fourth Circuit's decision clarified that this definition is too pronged and requires both that it be generally accepted but also as a floor that the practices be above the minimum standards under the Animal Welfare Act. And the Grand Court in Texas said that's a determination the court has to make on its own. Now, we're not just looking at these experts' opinions. And that's certainly relevant to the generally accepted problem under this definition. But in this case, there was ample evidence that the cricket hollow folks, the sellers, weren't complying even with the minimum standards under the Animal Welfare Act as it relates to both species. There were multiple findings, again, based on the citations that they've been – that they've received over – I think it was 19 citations over a five-year period, many times for the same repeat conduct. Well, you had tigers that died. What, three of them in one month or something with no explanation, no scientific – just what they died of? Correct, Your Honor. So you'd have to assume there was a lack of some kind of care that should have been provided that wasn't. That's correct, Your Honor. I mean, the district court's conclusion as to those facts is what led the court to conclude there was a harm based on inadequate veterinary care. Well, the purpose of finding out, of course, is that you've got other animals. So if they had something that you had to take some steps to protect the other animals from having a similar fate, that's the reason you do that. That's correct, Your Honor. Yeah, but that didn't happen here. Right. The absence of veterinary care was a critical factor in the first place. And I think as to moving the animals, it's got to be at some place where they do have veterinary services of some kind. And that's kind of queasy in the record. As to which facilities have better?  Well, as you said, the district court found veterinary care lacking here. They do have a vet, veterinarian, but it's primarily, I mean, he's not a specialist like some of these are. In other words, what level of veterinarian care could these appellants provide that would satisfy the requirements of the Act? Well, they didn't have a vet on site, on staff. I mean, the record for most of these incidents was that Mrs. He couldn't afford, I shouldn't say he couldn't afford it, but to have one on call, as it were. What do the standards require, that a vet visit these places every day, continuously monitoring the tigers, the lemurs, and everybody else? Well, I think it should be a vet who's qualified to treat these species. Frankly, the needs of a horse, I'm not an expert myself, but the needs of a horse versus the needs of an exotic feline are quite different. These lemurs tend to be about as temperamental as opera singers. And I don't mean to be flip about that, but they suffer from boredom, they suffer from this. In fact, I've never heard of animals being bored. No, I didn't mean to be flip. It was a very educational experience to read these briefs. My question is, what do we do with the district court's findings? So, inadequate veterinary care related, that was a finding that the court made in support of its harm determination for the tigers. For the harassment, there was the social isolation you mentioned. There was the environmental enhancement plan, the lack of adopting or implementing one. Again, I have to keep from laughing, the bowling ball versus the suitable toys, as it were. But, that was, again, one of the bases for, one of the facts elicited for the tigers. And it wasn't one of the bases of the district court's taking finding. But, unsanitary conditions were common to both animals, and were a major part of the court's finding of harassment here. And there again, I look back at my childhood on the farm, and I have a hard time wondering how you could satisfy any lover of aesthetics view of the feces. How often, does it have to be spotless? Well, they had these problems repeatedly with the, as the citation showed, they would come back and people would estimate that the amount of feces in there had been there accumulating for weeks and weeks. Weeks and weeks, not days and days. No, right. I briefly want to mention our request that the court... To take judicial notice of the motion? Not that, but the attorney's fee issue. I briefly will mention it was briefed and I don't need to go over it. But, at a minimum, we request that this issue be remanded for proper consideration on a proper record of attorney's fees, applying the proper standard and not the ERISA factors to determine whether an award of attorney's fees... Isn't this kind of a moot issue, though, because it doesn't appear to me that the defendants in the case have any money. Well, Your Honor, that is a factor that is not appropriate to consider under the... In other words, what I'm saying is, I think you're correct, the standard that the court used was under ERISA, not under the Endangered Species Act. But my question is, so what? What are they going to get even if we remand it? And there's no guarantee that the district judge won't find, deny attorney fees anyway. Certainly. That's a question that I think the district court could consider with a proper record, rather than a summary denial of the issue before it had been briefed. Well, I suppose the imposition of attorney's fees, whether they get paid or not, would constitute quite a bargaining point for your clients, if they seek to impose similar liability upon other zoos around the country. In other words, that's sort of a coercive settlement effect. But anyway, that's neither here nor there. But we will consider what you just said. I'm interested. Which firm are you with, if you might? I'm with Dentons. With what? Dentons. Okay. Where are you located? Kansas City. Oh, Kansas City, right. Well, we thank you for your effort. Thank you very much, Your Honor. They have more than two lawyers at that firm, right? About 4,000? Yeah. All right. Well, we'll hear Mr. Tom Thorson in rebuttal. Thank you, Your Honor. I'm going to start kind of in reverse order here, because I can remember it better that way. But there was talk about whether the vet was a good enough vet for this facility. And the answer is, yes, he was a good enough vet for this facility. Well, the record shows that the relationship between your client and the vet were phone calls over a period of several years in which they paid the vet a magnificent sum of something $6,300. Is that right? That's correct, Your Honor. And also, he visited the facility each year at least. He would come by. He would do a walk-through, look at all the animals, look at their conditions. And in addition, the vet could talk to the Henry Dorling Zoo, for instance. He did testify and talk to the Henry Dorling Zoo about tigers and lemurs. And also, she talked to the Covance Research Center up in Wisconsin about lemurs and other primates that she had at her facility. As far as the conditions at the locations we're talking about here, I think if you look at our supplemental appendix, starting on page one, we have inspection reports for these facilities. And most of these inspection reports show no noncompliances, which is a good thing, obviously. I think the court did not have to send these animals to the best facility in the country. I don't think they had to send them to Duke. Duke wouldn't take them anyway. Duke is full of lemurs, so it doesn't have room for them anymore. In any event, I think the court exercised its discretion at the hearing and decided these facilities were good enough facilities to send the animals to. And the inspection reports are here for this court to examine. With regard to standing, I think it's important to look at ALDF, because ALDF is the only one that incurred attorney's fees here and costs. The individual plaintiffs did not incur any attorney's fees or costs with regard to this litigation. One more thing I want to point out is that Judge Malloy was on a case involving PETA versus Miami Sea Aquarium, which is reported at 189 Fedsup 3rd, 1327 in the Southern District of Florida in 2016, involving a similar situation to what we're talking about here as far as analysis of the statute, analysis of the worst wrasse and harm, and again, whether those terms apply to any type of violation or apply to what they call a grave or gravely threatening violation. And even though that was a different statute, it's not the Wildlife Service that handles that. It's marine animals of some sort that handles that particular violation. Would that analysis where, in other words, is that similar to the analysis that the dissenting judge in Hill reached? I believe it is, Your Honor. I think it has to have some kind of level of materiality here. In other words, it just can't be a violation. I was reading the majority opinion. I will say, whoever wrote it said, secure the justicability of this case. I've never been that secure about anything in my decisions, but I take comfort from this. Maybe my law clerk's going to write that in and ask him to clean out the desk. No, I should be serious about it, but it's an interesting opinion, and obviously it's one, like you said, the dissent will have to give careful review of, and as well as everything. We thank both sides for the argument. The case is submitted, and we will take it on record.